UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**AVIATION ONE OF FLORIDA, INC.,**

    **Plaintiff,**

v.                                                       Case No: 6:13-cv-1243-Orl-41DAB

**CLYDE & CO., LLP,**

    **Defendant.**

                                               /

**ORDER**

THIS CAUSE is before the Court on Plaintiff's Motion to Serve Jurisdictional Discovery ("Plaintiff's Discovery Motion," Doc. 109), and Plaintiff's Motion for Leave to File Reply (Doc. 117). In response to Plaintiff's Discovery Motion, Defendant Clyde & Co., LLP ("Clyde"), seeks dismissal of this case due to a forum-selection clause. As set forth below, this case will be dismissed and Plaintiff's motions will be denied.

        **I.**        **BACKGROUND**

Plaintiff's claims are all tied to the crash of Plaintiff's Beech model 1900C aircraft (the "Aircraft"), in Guinea, West Africa. (Am. Compl., Doc. 67, ¶¶ 8, 27, 30, 34). At the time of the crash, the Aircraft was leased by Africa Tours and Travel, LLC d/b/a SA Guinee ("SA Guinee"), a Georgia limited liability company. (*Id.* ¶¶ 4, 12–13). The lease agreement required SA Guinee to procure and maintain insurance on the Aircraft. (*Id.* ¶¶ 14–15). SA Guinee engaged Airborne Insurance Consultants (PTY), LTD ("Airborne"), an insurance broker located in South Africa, to procure the necessary insurance on SA Guinee's behalf. (*Id.* ¶¶ 2, 14). Airborne procured insurance from Guardrisk Insurance Company, Ltd. ("Guardrisk"), also located in South Africa. (*Id.* ¶ 19 & n.1).

After the crash, Guardrisk denied Plaintiff's claim. (*Id.* ¶ 30 & n.2). At some point after the denial, Airborne referred Plaintiff to its legal counsel, Clyde, which is located in the United Kingdom. (*Id.* ¶¶ 5, 34). According to Plaintiff, Clyde failed to disclose a conflict of interest created by representing both Airborne and Plaintiff. (*Id.* ¶¶ 35–36).

Plaintiff asserted claims against Airborne, SA Guinee, a member of SA Guinee, Mohamed Diaoune, and Clyde. At this stage in the litigation, all Defendants except Clyde have been dismissed. (March 18, 2015 Order, Doc. 93, at 17; Feb. 11, 2016 Order, Doc. 107, at 18). Relevant here, Defendants Airborne and Clyde moved for dismissal for lack of personal jurisdiction, which this Court granted. (*See generally* March 18, 2015 Order). In its Motion to Dismiss (Doc. 75), Clyde also sought dismissal for improper venue based on a forum-selection clause contained in the retainer agreement that governed its relationship with Plaintiff. At the time, the Court did not address the venue argument because it determined that it lacked personal jurisdiction over Clyde. Subsequently, Plaintiff filed a Motion for Reconsideration (Doc. 94). While the Court declined to reconsider its previous Order, it permitted Plaintiff to file a renewed motion for jurisdictional discovery as to Clyde, (Feb. 11, 2016 Order at 17–18), which is the Discovery Motion currently before the Court. In response to Plaintiff's Discovery Motion, Clyde requested that this Court first address its venue arguments made in its Motion to Dismiss that the Court previously declined to address due to the personal jurisdiction analysis.

The question of personal jurisdiction, . . . is typically decided in advance of venue," however, "when there is a sound prudential justification for doing so, . . . a court may reverse the normal order of considering personal jurisdiction and venue." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Indeed, "a district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection"

such as personal jurisdiction. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). Here, to determine the personal jurisdiction issue, the parties would be required to undergo costly discovery, which would also likely involve oversight by the Court. (*See* Clyde's Resp. to Pl.'s Discovery Mot., Doc. 114, at 19 ("Clyde notes that [Plaintiff's proposed discovery] requests raise privilege issues, and, should the Court allow discovery, Clyde will assert all appropriate objections.")). Accordingly, to conserve both judicial and the parties' resources, the Court will first address the venue arguments. *See MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 27 (D.D.C. 2008), *aff'd*, 616 F.3d 568 (D.C. Cir. 2010) ("[A] court may dismiss a case on the basis of *forum non conveniens* in lieu of addressing questions of subject matter and personal jurisdiction, particularly where, . . . those inquiries raise difficult issues that might otherwise require jurisdictional discovery.").

As to Clyde's venue arguments, Plaintiff seeks to file a reply. However, Clyde merely restates the venue arguments raised in its Motion to Dismiss, which were fully responded to by Plaintiff. (*See* Pl.'s Resp. to Clyde's Mot. Dismiss, Doc. 79, at 13–19). The Court has reviewed Plaintiff's arguments asserted therein and finds no need for additional briefing.

## II. FORUM-SELECTION CLAUSE

The undisputed facts with regard to the forum-selection clause are as follows. Clyde sent Plaintiff an engagement letter that incorporated by reference the 2009 Terms and Conditions, and the two documents together formed the agreement between the parties. (Engagement Letter, Ex. E to Am. Compl., Doc. 67-3, at 39).[1] It is also undisputed that Clyde provided Plaintiff with the 2010 Terms and Conditions. (Langley Aff., Doc. 75-1, ¶¶ 23–24; 2010 Terms and Conditions, Doc. 75-

---

[1] Where, as here, documents contain multiple exhibits, pinpoint citation is to the electronic page number.

1, at 17; Pl.'s Resp. to Clyde's Mot. Dismiss at 16). Although Plaintiff asserts it never received the 2009 Terms and Conditions, when Plaintiff's representative signed the agreement, he also verified that he had received the 2009 Terms and Conditions and agreed to be bound by them. (Signature Page, Doc. 75-1, at 34). The 2009 and 2010 Terms and Conditions contain identical forum-selection clauses. (*Compare* 2010 Terms and Conditions at 25 *with* 2009 Terms and Conditions, Doc. 85-2, at 8).

Neither party advances a formation argument—they both appear to acknowledge that they agreed to be bound by the 2009 Terms and Conditions. Therefore, Plaintiff is bound by the forum-selection clause contained therein unless Plaintiff can prove that the clause is invalid.

At the outset, the Court notes that this agreement is between a Florida company and a United Kingdom-based law firm for representation in litigation in South Africa involving a plane crash in West Africa and companies based in South Africa and the United States. As such, the agreement is "truly international" in character. Therefore, the analysis set forth in *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1 (1972), and its progeny applies. *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1294 (11th Cir. 1998) (noting that the U.S. Supreme Court "consistently has treated truly international agreements differently than domestic transactions" and recognizing that *Bremen* applies to international agreements (quotation omitted)); *see also Bremen*, 407 U.S. at 15–17 (holding that "in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside" and emphasizing that the case did not involve "an agreement between two Americans to resolve their essentially local disputes in a remote alien forum"); *Liles v. Ginn-La W. End, Ltd.*, 631 F.3d 1242, 1246 (11th Cir. 2011) (per curiam) (determining that the contracts and underlying transactions were "truly and fundamentally international" where they

involved residents of two countries and the purchase of property located in one country by a resident of another country (quotation omitted)).

Under the *Bremen* analysis, "[f]orum-selection clauses are presumptively valid and enforceable unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009) (per curiam) (first quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 591, 593–95 (1991); then citing *Bremen*, 407 U.S. at 10). Forum-selection clauses are "unreasonable" and "thus unenforceable" only if a plaintiff can establish one of the following: "(1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy." *Lipcon*, 148 F.3d at 1296; *see also Krenkel*, 579 F.3d at 1282. Plaintiff asserts that the forum-selection clause at issue is unenforceable because it was induced by fraud or overreaching and because Plaintiff would effectively be deprived of its day in court if the clause were enforced.

### A.  Fraud or Overreaching

The analysis of whether there was fraud or overreaching in the procurement of a forum-selection clause varies slightly if the clause was negotiated or non-negotiated. Plaintiff summarily asserts that the forum-selection clause at issue was non-negotiated, but the Court is not convinced that such a categorization is correct.

The seminal case on the issue of forum-selection clauses in international agreements is *Bremen*. In *Bremen*, the United States Supreme Court abandoned the historical view of American courts disfavoring forum-selection clauses and held that "such clauses are prima facie valid and

should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." 407 U.S. at 9–10. The *Bremen* Court based its holding, in part, on the "compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power . . . should be given full effect." *Id.* at 12–13. Specifically relevant here is the Court's reference to a "freely negotiated" agreement. Due to that reference, it was unclear whether forum-selection clauses were also presumptively valid if they were included in non-negotiated agreements. The Supreme Court resolved this confusion in *Shute*. The forum-selection clause at issue in *Shute* was contained in a contract for cruise tickets. 499 U.S. at 587. While the *Shute* court determined that forum-selection clauses in such non-negotiated, adhesion contracts were still presumptively valid, it noted that, under those circumstances, the forum-selection clauses should be more closely scrutinized. *Id.* at 594–95.

The contract at issue here appears to fall somewhere in between the actively negotiated contract in *Bremen*—where the terms of the contract were altered by each side—and the adhesion contract in *Shute*—where a form contract was presented to consumers with almost no bargaining power and with no ability to negotiate. Plaintiff oversimplifies the distinction between a negotiated and a non-negotiated clause, indicating that if the clause was not actually negotiated—regardless of the ability of the parties to negotiate—then it must be scrutinized under the non-negotiated standard. However, there is a difference between "not negotiated"—where the parties simply do not alter the terms of a contract but could have if so inclined—and "non-negotiated"—where one party does not have the ability to alter the terms of the contract. *See Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 545–46 (D.N.J. 2013) (rejecting the plaintiff's argument against enforcing an arbitration clause because it was presented on a take it or leave it basis and reasoning that the plaintiffs "presented no evidence that they were not free to negotiate the terms of the

Employment Agreement containing the Arbitration Clause; indeed, they have presented no evidence that they even tried to do so. Plaintiffs' unsupported belief that the Company would have insisted, or did insist, on these terms is insufficient").[2] The latter is what concerned the Court in *Shute*.

The Eleventh Circuit case of *Liles* is instructive. The *Liles* plaintiffs each entered into land purchase contracts, which contained forum-selection clauses. 631 F.3d at 1242–43. These contracts were essentially form contracts—all of the terms were nearly identical, and there was only evidence that one of the contracts had been altered in any manner. *Id.* at 1246, 1247. Nevertheless, the *Liles* court determined that the agreements were negotiated. *Id.* at 1246. In so holding, the court noted that the "contracts concerned sophisticated real estate transactions involving large sums of money . . . rang[ing] from $525,900 . . . to $1,370,900" and indicated that, in such a situation, the concerns at issue in *Shute* were not present. *Id.* at 1247; *see also Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006) (rejecting, in an opinion relied on by *Liles*, the plaintiff's argument that a contract to distribute the defendant's products was an adhesion contract because it was "a somewhat sophisticated business deal . . . worth more than $100,000").

Here, Plaintiff was retaining Clyde to represent it in legal proceedings involving over a million dollars in potential damages, (*see* Am. Compl. ¶ 28 (indicating that the "estimated cost of repair" to the Aircraft was "$1,145,000"), stemming from, at least a somewhat, sophisticated international business deal. As indicated by *Liles*, such business dealings do not implicate the concerns at issue in *Shute* and, thus, do not require the same level of scrutiny. Moreover, the

---

[2] Although *Beery* was decided regarding an arbitration agreement, its analysis is applicable. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) (noting that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause").

Engagement Letter sets forth the requirements for varying the terms of the agreement, (Engagement Letter at 39 ("Please note that any variation may only be agreed in writing by a Partner of the Firm.")), and, in the e-mail to Plaintiff containing the Terms and Conditions, Clyde's representative, Alex Stovold, stated: "If you have any queries, please do not hesitate [to contact] either myself or Gareth Lewis," another of Clyde's representatives, (Apr. 30, 2010 E-mail, Doc. 75-1, at 8). Thus, it is reasonable to believe that Clyde was open to negotiation of the terms of the agreement. The agreement at issue here is far different from the adhesion contract at issue in *Shute*; here the parties simply did not negotiate, but the parties' dealings indicate that Plaintiff could have negotiated if it so chose.

Nevertheless, even if this was a non-negotiated clause, it is still enforceable. "In determining whether there was fraud or overreaching in a non-negotiated forum-selection clause, we look to whether the clause was reasonably communicated to the consumer." *Krenkel*, 579 F.3d at 1281. "A useful two-part test of 'reasonable communicativeness' takes into account the clause's physical characteristics and whether the plaintiffs had the ability to become meaningfully informed of the clause and to reject its terms." *Id.*

Plaintiff does not make any arguments regarding the clause's physical characteristics other than a brief mention that the clause was not conspicuous. In developing this argument, however, Plaintiff does not actually mention the clause's physical appearance; Plaintiff instead focuses on the fact that it was provided the 2010 Terms and Conditions but the Engagement Letter referenced the 2009 Terms and Conditions. This argument goes to whether the forum-selection clause was reasonably communicated to Plaintiff, not the physical characteristics of the clause itself.

Indeed, Plaintiff primarily focuses on that argument: that the forum-selection clause was not reasonably communicated because the 2010 Terms and Conditions, rather than the 2009 Terms

and Conditions, were provided to Plaintiff. Importantly, the 2009 and 2010 Terms and Conditions contained the exact same forum-selection clause. The purpose of the "reasonable communicativeness" test is to determine whether there was fraud or overreaching with regard to the inclusion of the forum-selection clause, not with regard to the contract in general. *Lipcon*, 148 F.3d at 1296.[3] Seen in that light, Plaintiff's argument does not make sense. Plaintiff is attempting to establish that the inclusion of the forum-selection clause in the retainer agreement was fraudulent because Clyde sent Plaintiff the wrong Terms and Conditions, but the Terms and Conditions that were sent to Plaintiff contained the very forum-selection clause that Clyde was supposedly trying to conceal. Moreover, the requirement under the reasonable communication test is that the forum-selection clause itself be communicated, not the entirety of the contract in which the forum-selection clause is a part. It is undisputed that Plaintiff received the language of the forum-selection clause,[4] and Plaintiff's argument places form over substance.

Plaintiff also asserts that it did not have the ability to become meaningfully informed of the clause and to reject its terms. In this vein, Plaintiff primarily argues that its representative, Mr. Udey, was unsophisticated and could not have understood the terms of the forum-selection clause

---

[3] The requirement that the fraud or overreaching regard the inclusion of the forum-selection clause itself also makes Plaintiff's arguments regarding alleged fraudulent behavior in connection with Defendant's representation of Plaintiff in the South African litigation irrelevant. Similarly, Plaintiff's argument that the reference to the 2009 Terms and Conditions along with the provision of the 2010 Terms and Conditions creates ambiguity goes to the contract as a whole, not the forum-selection clause. Plaintiff has not made any argument that the language of the forum-selection clause itself was ambiguous.

[4] Plaintiff makes a somewhat confusing argument that it does not know whether the agreements between Clyde and the local counsel in South Africa contain forum-selection clauses because Plaintiff never received copies of those agreements. However, the dispute at issue here is between Plaintiff and Clyde and is governed by the retainer agreement; the contents of an agreement between Clyde and other attorneys are irrelevant.

even if he had read it.[5] This argument is unavailing. The ability of a party to become meaningfully informed does not equate to an ability on the part of that party to understand the document he is reading. For example, if a party does not speak the language in which the contract is written, he can still become meaningfully informed of its contents by obtaining a translation. Further, whether or not he actually obtains a translation, he has had the opportunity to become meaningfully informed if he has the opportunity to obtain such a translation. *See, e.g.*, *Horvath v. Banco Comercial Portugues, SA*, 461 F. App'x 61, 63 (2d Cir. 2012) (rejecting the plaintiff's argument that the forum-selection clause was not reasonably communicated to him because the contract, including the forum-selection clause, was written in Portuguese, which the plaintiff did not speak, where there was no other evidence of fraud); *Sabino v. Kerzner Int'l Bahamas Ltd.*, No. 12-22715-CIV, 2014 WL 7474763, at *4–5 (S.D. Fla. 2014) (rejecting the plaintiff's argument that she did not have the opportunity to become meaningfully informed of the forum-selection clause, which was in English, because she did not read, write, or speak English where the plaintiff's daughter, who was acting as the plaintiff's representative, spoke English and accepted the provision on behalf of the plaintiff). Here, while Mr. Udey may not have understood the terms of the contract, Clyde did not inhibit Plaintiff's ability to obtain an explanation of the terms from another source. To the contrary, Clyde invited Plaintiff to ask questions when it provided Plaintiff the agreement.

Additionally, Plaintiff argues that Clyde rushed Plaintiff into signing the agreement, which prohibited Plaintiff from becoming meaningfully informed. A review of the e-mail cited by Plaintiff does not reveal such a situation. While the e-mail does emphasize that signing the agreement was "a matter of urgency" due to upcoming litigation deadlines, the e-mail also explains

---

[5] It is undisputed that Mr. Udey did not read the forum-selection clause or any other portion of the agreement.

that the first deadline was "the end of May 2010"; the e-mail was sent on April 30, 2010. (Apr. 30, 2010 E-mail at 7–8). Thus, while it was clear that Plaintiff should not unduly delay, it was also clear that Plaintiff's representative had time to review the documents or have someone else review them on his behalf. *See Beery*, 953 F. Supp. 2d at 545 (rejecting the plaintiffs' claim that they did not have an opportunity to become meaningfully informed regarding an arbitration provision because they were rushed by the defendants' representatives where the plaintiffs "presented no evidence that they were prevented from reading the Agreement").

Finally, there is no indication that Plaintiff did not have the opportunity to reject the forum-selection clause with impunity. *See Shute*, 499 U.S. at 595 (determining that the forum-selection clause was enforceable because, *inter alia*, the plaintiffs "retained the option of rejecting the contract with impunity"). There is no argument or indication that Plaintiff had paid Clyde a deposit that it would forfeit if it rejected the retainer agreement. (*See* Apr. 30, 2010 E-mail at 7 (requesting payment in conjunction with signing the agreement)); *c.f. Corna v. Am. Haw. Cruises, Inc.*, 794 F. Supp. 1005, 1011 (D. Haw. 1992) (determining that the plaintiffs did not have a reasonable opportunity to reject the forum-selection clause where "[u]nder the terms of the contract, plaintiffs would have forfeited the entire ticket price if they canceled their trip at [the] time" they received the forum-selection clause). Additionally, there is no indication that Plaintiff could not have retained different attorneys if it were unsatisfied with the terms of Clyde's agreement.

Accordingly, even if the forum-selection clause was non-negotiated, it was reasonably communicated to Plaintiff, and Plaintiff has presented no other indication of fraud or overreaching.

### B.  Deprivation of Day in Court

Plaintiff also argues that being required to pursue its cause of action in England "will likely deprive [Plaintiff] of any remedy, having invested heavily in a fruitless effort to recoup the loss of

its primary asset and source of income." (Pl.'s Resp. to Clyde's Mot. Dismiss at 18). However, "[t]he financial difficulty that a party might have in litigating in the selected forum is not a sufficient ground by itself for refusal to enforce a valid forum-selection clause." *Rucker v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1237 (11th Cir. 2011) (quoting *P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003)). Moreover, Plaintiff has not explained why litigating in England would be more costly than litigating here. While Plaintiff is located in Florida, it appears that the other witnesses and documents are just as likely to be located in England or South Africa. (*See, e.g.*, Proposed Jurisdictional Discovery, Doc. 109-2, at 3–6 (setting forth proposed requests for production regarding allegedly fraudulent actions taken by Clyde to support Plaintiff's claim of intentional tort, requesting primarily communications between Clyde and various South African entities and documents that would be in Clyde's possession in the United Kingdom)).

With regard to Plaintiff's argument that litigation in England would be more costly because Plaintiff would be forced to litigate in multiple forums, that argument was made prior to the dismissal of the other Defendants in this case, and the concern over litigating in multiple forums is no longer applicable. Accordingly, Plaintiff has not established that litigating this matter in England would deprive it of its day in court.

Furthermore, Plaintiff has not made any argument that it would be deprived a remedy under the laws of England,[6] nor has Plaintiff made any arguments with regard to public policy. Therefore, Plaintiff has failed to establish that the presumptively valid forum-selection clause is unenforceable, and the Court must now undertake a *forum non conveniens* analysis.

---

[6] While Plaintiff asserts that the choice of law provision, selecting English law as the controlling law, is unenforceable for the same reasons as the forum-selection clause, it does not argue that the application of English law would be detrimental to its claims.

### III. FORUM NON CONVENIENS

As an initial matter, neither party made any argument regarding the *forum non conveniens* analysis because both parties analyzed the motion under Federal Rule of Civil Procedure 12(b)(3). While the Eleventh Circuit once endorsed utilizing Rule 12(b)(3) as the mechanism by which forum-selection clauses should be enforced, *Estate of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1238 (11th Cir. 2012); *Lipcon*, 148 F.3d at 1289–90, the Supreme Court rejected that view and held that 28 U.S.C. § 1404(a) is the proper "mechanism for enforcement of forum-selection clauses that point to a particular federal district," while "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 579–80 (2013).

Where the parties have entered a valid forum-selection clause, however, the traditional *forum non conveniens* analysis is modified. "In the typical case not involving a forum-selection clause, a district court considering . . . a *forum non conveniens* motion . . . must evaluate both the convenience of the parties and various public-interest considerations." *Id.* at 581. However, "where there is a valid forum-selection clause . . . , the burden is on the plaintiff to show that dismissal of the complaint is unwarranted, and a court may weigh only public interest factors in determining if a plaintiff has met this burden." *Pappas v. Kerzner Int'l Bahamas Ltd.*, 585 F. App'x 962, 964 (11th Cir. 2014) (citing *Atl. Marine Constr.*, 134 S. Ct. at 581–83). Moreover, the public interest "factors will rarely defeat a transfer motion,[7] [and therefore,] the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine Constr.*, 134 S. Ct. at 582.

---

[7] Although the court was referencing transfer under § 1404(a), it also noted that the analyses are essentially the same and that "[§] 1404(a) is merely a codification of the doctrine of *forum non*

"Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 581 n.6. As noted, Plaintiff has made no argument with regard to these factors. Nevertheless, the Court finds that the public interest factors are either neutral or weigh in favor of litigating this case in England. As to the first factor, this Court has no knowledge of the congestion of the courts of England, but it notes that the Middle District of Florida is one of the busiest districts in the United States, and therefore, it is unlikely that Plaintiff would face any more congestion in England than it does here. As to the second factor, the subject-matter of this dispute is an international business transaction with minimal ties to Florida. It is not a localized controversy. Finally, the last factor favors trial in England. As noted, the agreement includes a choice of law provision designating English law. Undoubtedly, English courts would be more familiar with English law than this Court. Accordingly, Plaintiff has failed to establish that any public interest factors overcome the weight of the forum-selection clause, and Plaintiff's case will be dismissed pursuant to the doctrine of *forum non conveniens*.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Leave to File Reply (Doc. 117) is **DENIED**.
2. Plaintiff's Motion to Serve Jurisdictional Discovery (Doc. 109) is **DENIED as moot**.
3. This case is **DISMISSED without prejudice**.

---

*conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Atl. Marine Constr.*, 134 S. Ct. at 580.

4. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on August 26, 2016.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record